Charles Potter appeals from a judgment of the Clark County Court of Common Pleas, Domestic Relations Division, Juvenile Section, which granted permanent custody of his four children to the Clark County Department of Human Services ("CCDHS") pursuant to R.C. 2151.413 and terminated his parental rights.
Potter's children are Charles Jr., who was born in 1990; Christine, born in 1991; Chelsey, born in 1992; and Candace, born in 1993. CCDHS became involved with Potter, his four children, and the children's mother in early 1995 as a result of reports of physical abuse and of the children being left at home alone. At that time, Candace was placed in the temporary custody of another family, and Potter remained the primary care giver for the three older children, except that the older children were cared for by relatives while Potter was briefly incarcerated. CCDHS developed a case plan for Potter aimed at preventing the removal of the children then in his care and at returning Candace to his care. The case plan required Potter to work with the agency to assess the needs of the family, to attend parenting classes, to be assessed for drug and alcohol abuse, and to complete any therapeutic treatment recommended as a result of the drug and alcohol abuse assessment. At some point, Candace was returned to her father's custody.
In 1996, officials at Charles Jr.'s school reported signs of physical abuse to the police, and Charles Jr. and Christine described abusive events when interviewed. As a result, all of the children were temporarily removed from Potter's custody and placed in foster homes. Potter's case plan was updated to reflect the removal of the children and to provide for visitation with the children, but the requirements of the plan remained essentially the same. Throughout the time that the case plan was in effect, the children's mother was only sporadically involved in their lives and was not involved in their care in any significant way.
Based on the children's behavior while in foster care, CCDHS workers came to believe that each of the Potter children had been sexually abused by their father. In September 1997, CCDHS filed a Motion to Modify Temporary Custody to Permanent Custody. At that time, CCDHS workers felt that Potter had taken no significant steps toward the accomplishment of any of the case plan objectives and had missed a significant number of scheduled visits with his children. Since the implementation of the original case plan, Potter had also been incarcerated numerous times on domestic violence, burglary, receiving stolen property, and theft charges, in addition to sexual abuse charges.[1]
The trial court conducted a hearing on the CCDHS motion over several days in July 1998. The mother did not respond to the motion and was found to be "in default." Potter participated fully at the hearing. The trial court granted the CCDHS motion on August 10, 1998.
Potter raises four assignments of error on appeal. Because of the similarity of the issues presented, the first, third, and fourth assignments of error will be considered together.
 I. THE COURT ERRED AS A MATTER OF LAW WHEN IT DETERMINED THAT IT WAS SHOWN BY CLEAR AND CONVINCING EVIDENCE THAT IT WAS IN THE BEST INTEREST OF THE CHILDREN TO GRANT PERMANENT CUSTODY TO THE CLARK COUNTY DEPARTMENT OF HUMAN SERVICES.
 III. THE COURT ERRED WHEN IT AWARDED PERMANENT CUSTODY TO DEPARTMENT OF HUMAN SERVICES WHEN THE PARENT HAD SUBSTANTIALLY COMPLIED WITH THE CASE PLAN.
 IV. THE COURT ERRED WHEN IT DETERMINED THAT IT WAS SHOWN BY CLEAR AND CONVINCING EVIDENCE THAT THE CHILDREN COULD NOT BE PLACED WITH EITHER PARENT WITHIN REASONABLE TIME.
Under these assignments of error, Potter contends that his parental rights should not have been terminated because the evidence established that he was a good father and that the children had been clean, fed, and clothed while in his care. Potter claims that the only problem identified by the testimony at the hearing related to his discipline of the children. Potter also claims that he substantially complied with his case plan and that the children could have been reunited with him within a reasonable period of time.
Prior to terminating parental rights and granting permanent custody of a child to a county children services agency, a trial court must find, by clear and convincing evidence, that the agency made a good faith effort to reunify the family, that the parents acted so as to leave the child without adequate parental care and will continue to do so in the near future, and that it is in the best interests of the child to permanently terminate parental rights. R.C. 2151.414(B); In re Lay (1987), 43 Ohio App.3d 78, 79. To the extent that these determinations turn on the witnesses' credibility, we defer to the trial court's findings because the "decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the fact finder, who has seen and heard the witness." State v. Lawson
(Aug. 22, 1997), Montgomery App. No. 16288, unreported.
CCDHS presented testimony from several of Potter's neighbors and babysitters that Potter had yelled and cursed at his children, that he had hit the children all over their bodies, including their heads and faces and including the use of his fists and a belt, and that the children had sometimes been left unsupervised. These witnesses also testified that they had seen drugs in the house, that Potter had used drugs in the presence of the children, that he had consumed alcohol frequently, and that the children had often been hungry and dirty. One babysitter, Barbara Weis, testified that Christine and Chelsey had not been "allowed off the couch most of the time" and that she had been raped by Potter on one occasion.
CCDHS workers and employees of the support services agencies to which Potter had been referred in his case plan also testified at the hearing. CCDHS case worker Chad Lough testified that Potter had poor parenting skills and substance abuse problems, that he was "overwhelmed" by the children, and that Potter had not taken advantage of any of the services offered to him, including day care and homemaker services. An employee of the agency to which Potter had been referred for the parenting classes required by his case plan testified that he had not attended any parenting classes, although he had attended a support group several times.
Another CCDHS case worker, Angelia Riley, testified that, to her knowledge, Potter had not completed any of the case plan objectives. Potter had refused to sign the releases necessary for the referral agencies to report to CCDHS on their evaluations of him, and Potter had not provided the agency with verification that he had completed the required assessments, treatments, and classes. Riley introduced a letter from the alcohol and drug treatment agency indicating that Potter had refused to complete its assessment program. Riley also testified that Potter had failed to attend eight of the twenty-five scheduled visits with his children during the periods when he had not been incarcerated. Riley discussed her efforts to talk with and remind Potter about his failure to make progress on his case plan, and she stated that these discussions had often turned into arguments about why he needed to meet the objectives set forth in the plan. She said that she had made transportation, information, day care, and referrals available to Potter, but that he had not taken advantage of these services.
Therapists who had worked with the children testified that the children had recounted incidents of physical and sexual abuse by their father or had acted out such scenarios in "play therapy." They also testified that the children's displays of sexual, violent, and other destructive and unusual behaviors were characteristic of young children who have been traumatized. They explained that the abuse and neglect of the children at young ages, and of Candace in particular, had led to significant developmental problems that would take years of therapy and special attention to address. The foster parents' testimony buttressed these conclusions, recounting a plethora of examples of inappropriate sexual behavior by the children, including the sexual abuse of other children, and of incidents in which the children seemed to take pleasure in violence such as killing a family cat. These witnesses indicated that the children's behavior was improving in their foster homes, and some of the foster parents expressed interest in adopting the Potter children.
Potter was cross-examined by CCDHS in its case-in-chief, and he testified on his own behalf. He denied that he had ever physically or sexually abused his children and claimed that their problems had been caused by removal from his custody. He readily admitted, however, that he had beaten the children's mother and had been in jail several times on domestic violence convictions. With regard to the parenting classes required by the case plan, Potter testified that he had gone to meetings, but he could not differentiate between parenting classes and the support group, and he blamed missing classes on his lack of transportation, on the time he spent in jail, and on his inability to miss work because of his desire to support his children. With regard to the requirement that he complete an alcohol and drug abuse assessment and any treatment recommended in response, Potter alternately claimed that he had been turned away from treatment, that he had been told three or four times by the agency that he did not need treatment, that he "did not want something [he] didn't need," and that he did not think he should have to complete the case plan in order to get his children back. Potter could provide no documentation of his claim that the agency had told him he did not need treatment. When asked if he accepted any responsibility for what was happening with the children, Potter testified that his children had been placed in foster care "for something that had nothing to do with [him]," that the children's mother and CCDHS had "done [this] to [him]" and had "been dragging [him] down," and that he did not need any help. When, on direct examination, Potter finally admitted that he needed "serious counseling," he still viewed it as a big problem to schedule counseling around his work schedule. Potter also presented testimony from friends and his sisters that he had not physically or verbally abused his children and that he was a "great" father.
The children's guardian ad litem recommended that permanent custody be granted to CCDHS.
Based on the evidence presented, the trial court concluded that CCDHS had proven, by clear and convincing evidence, that it had made a good faith effort to reunify the family, that Potter had not provided the children with adequate parental care and would not be able to do so within a reasonable time, and that it was in the best interests of the children to terminate parental rights. The trial court apparently found Potter's unsubstantiated claims that he had completed parenting classes and that he had not needed or had been turned away from substance abuse treatment not to be credible. It further found that Potter was not committed to working hard to provide for the children's needs or to making the sacrifices necessary to provide an adequate permanent home for them. The court found that Potter's ability to care for the children had "not materially changed or improved" since the children were removed from his care and that he had not divorced himself from his numerous destructive and criminal habits. Because of their abuse and neglect, the trial court concluded that the children would need love and care beyond that normally provided by a parent, and that Potter was unable to meet even their most basic needs and was unlikely to be able to do so within a reasonable time.
The trial court reasonably concluded that CCDHS had worked diligently to reunify the family and had provided Potter with "the opportunity and the tools to get the children back in his home, but the father chose not to seriously work toward that goal." Based on the overwhelming evidence that Potter had made little, if any, progress in fulfilling the objectives of his case plan in the three years since he and the children had become involved with CCDHS and his expression of little desire to work toward these goals at the time of the hearing, the trial court reasonably concluded that the children could not be placed with Potter within a reasonable time. Further, considering the trial court's finding that Potter could not "provide a safe, secure and appropriate home for the children any time soon" and its view that the children were capable of proper mental, physical, and emotional development if they received adequate care, the trial court reasonably concluded that it was in the children's best interests to terminate Potter's parental rights.
Potter's first, third, and fourth assignments of error are overruled.
 II. THE TRIAL COURT ERRED WHEN IT FAILED TO CONSIDER ALL ALTERNATIVES SET OUT BY STATUTE BEFORE GRANTING PERMANENT CUSTODY OF THE CHILDREN TO THE CLARK COUNTY DEPARTMENT OF HUMAN SERVICES.
Potter contends that the trial court erred in failing to consider the alternatives to terminating his parental rights, namely long-term temporary custody by CCDHS, long-term foster care, protective supervision of the children while in his care, and placement with relatives. In our view, the trial court did consider these alternatives, at least implicitly, and reasonably concluded that these options were unfeasible and not in the children's best interests.
In over three years, Potter had made very little progress toward the accomplishment of his case plan objectives, and he did not appear to be motivated to work toward these goals at the time of the hearing. Thus, it is unclear what purpose would have been served by further extending the temporary custody of CCDHS or foster care. The court found that, "[f]or the sake of the children it is harmful to continue in the limbo created by their father" and that there was a reasonable probability that the children could be adopted. For these reasons and the unlikelihood of any benefit to the children from further delay, the trial court reasonably rejected the option of an extended temporary arrangement.
Potter also suggests that the trial court should have considered protective supervision. Such an arrangement would have meant placing the children back in Potter's custody subject to any conditions that the court prescribed, including supervision by CCDHS. See R.C. 2151.011(B)(35). Considering the trial court's findings that Potter's home was unsafe for the children, that he had neglected their health, morals, and well- being, that he had taken no steps to correct these problems, that the children were doing well in their stable foster homes, along with the evidence that Potter had been incarcerated seven times over a two and one half year period, the court could have reasonably rejected any option that involved returning the children to Potter's care.
Finally, Potter suggests that the children should have been placed with members of his family. The trial court did explicitly consider this option but expressed doubt that the paternal relatives were appropriate care givers or were committed to addressing the significant needs of the children. The trial court also expressed concern about Potter's presence in the proffered family home and the extended period of time over which the relatives in question had had no contact with the children. The court found that it "would have to roll the dice with the children's fate" to place them with the paternal relatives and that it would not be wise to remove the children from the safety and security that they had found in their foster homes. This conclusion is amply supported by the record, and the trial court did not err in disposing of the case as it did.
The second assignment of error is overruled.
The judgment of the trial court will be affirmed.
. . . . . . . . . .
GRADY, P.J. and YOUNG, J., concur.
Copies mailed to:
 Roger A. Ward Albert Stewart Hon. Joseph N. Monnin
[1] Potter was tried in 1997 on charges of sexually abusing his children, but he was acquitted.